IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| DIMPLE KAMBOJ, | ) | |
| | ) | |
| Plaintiff, | ) | No. 05 C 4023 |
| v. | ) | |
| | ) | Hon. Mark Filip |
| ELI LILLY and COMPANY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER DENYING IN PART AND GRANTING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff, Ms. Dimple Kamboj ("Plaintiff" or "Kamboj"), brings this lawsuit against

Defendant Eli Lilly and Company ("Lilly" or "Defendant"), her former employer. Plaintiff

alleges breach of contract and fraudulent misrepresentation. Ms. Kamboj originally filed suit in

the Cook County Circuit Court, alleging that Lilly breached an oral contract to employ her as a

"senior sales representative," and to pay her a higher salary, higher tuition reimbursement, and

relocation expenses in exchange for Ms. Kamboj's agreeing to move to Chicago for a sales job

with the company. (*See* D.E.1 at 8 (state complaint).[1]) Defendant removed the case to this Court

pursuant to federal diversity-of-citizenship jurisdiction under § 1332(a).[2] (*See* D.E. 1 at 2 ¶ 7.) )

---

[1] The designation "D.E." refers to the docket entry number of the cited document.

[2] In her complaint, Plaintiff alleges damages of "in excess of $35,000" for her state-law claims, yet Defendant has removed the case under 28 U.S.C. § 1441(a) and 1441(b) pursuant to this Court's diversity jurisdiction under 28 U.S.C. § 1332(a). (*See* D.E. 1 at 2 ¶ 7.) Defendant states that diversity jurisdiction is proper because the case is between citizens of different states, and because "Plaintiff's counsel has conveyed a settlement demand to Lilly that well exceeds the $75,000 amount in controversy requirement." (D.E. 1 at 2 ¶ 6.) In a removal action, the defendant has the burden of establishing the amount in controversy by a preponderance of the evidence. *See Oshana v. Coca-Cola Co.*, — F.3d —, 2006 WL 3816041, *3 (7th Cir. 2006).

The case is before the Court on Defendant's Motion for Summary Judgment on all counts. (*See* D.E. 51.) For the reasons stated below, the Motion is granted in part and denied in part.

## FACTS

The Court takes the relevant facts from: Defendant's Statement of Undisputed Material Facts under Local Rule 56.1(a)(3) (D.E. 52) and exhibits (D.E. 52-2–D.E. 52-7); Plaintiff's Response to Defendant's Local Rule 56.1 Statement and Plaintiff's Statement of Additional Material Facts (D.E. 54) and exhibits (D.E. 54-2–D.E. 54-20); and Defendant's Response to Plaintiff's Rule 56.1 Additional Statement of Facts (D.E. 59). The Court resolves all genuine factual ambiguities in Plaintiff's favor. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The Court takes no position on whose version of disputed factual matters is true.

Local Rule 56.1 ("L.R. 56.1") requires that statements of facts contain allegations of material fact, and the factual allegations must be supported by admissible record evidence. *See* L.R. 56.1; *Malec v. Sanford*, 191 F.R.D. 581, 583–85 (N.D. Ill. 2000). The Seventh Circuit

---

Once the defendant has established the amount in controversy by a preponderance, the plaintiff can defeat jurisdiction only if it appears to a legal certainty that the claim is really for less than the jurisdictional amount. *See id.* (discussing *St. Paul Mercury v. Red Cab*, 303 U.S. 283, 289 (1938) (quotation marks omitted)). Plaintiff has not challenged the removal or Defendant's settlement representation that she was demanding in excess of $75,000. (The post-removal record also reflects that Plaintiff has maintained this view.) Therefore, the Court deems the amount in controversy to be in excess of the $75,000 requirement.

In addition, although certain threshold pleadings in this Court referred to Ms. Kamboj as simply being a "resident" of Naperville, Illinois (*see* D.E. 1 at 1, 8), rather than alleging her citizenship, this matter was subsequently clarified. ("Domicile" or "citizenship" is the relevant inquiry for diversity purposes under 28 U.S.C. § 1332.) Plaintiff's counsel subsequently clarified that she was a citizen of Illinois at the time the suit was removed—*see, e.g.*, *Denlinger v. Brennan*, 87 F.3d 214, 216 (7th Cir. 1996) (holding that domicile or citizenship is determined by physical presence in a particular location with the intent to remain there)—and therefore subject matter jurisdiction properly lies in this Court. Plaintiff will be expected to file an amended pleading to make this subject clear.

teaches that a district court has broad discretion to require strict compliance with L.R. 56.1. *See, e.g.*, *Koszola v. Bd. of Ed. of City of Chicago*, 385 F.3d 1104, 1109 (7th Cir. 2004); *Curran v. Kwon*, 153 F.3d 481, 486 (7th Cir. 1998) (citing *Midwest Imports, Ltd. v. Coval*, 71 F.3d 1311, 1316 (7th Cir. 1995) (collecting cases)). Where a party has offered a legal conclusion or a statement of fact without offering proper evidentiary support, the Court will not consider that statement. *See, e.g.*, *Malec*, 191 F.R.D. at 583 ("[A] movant's 56.1(a) statement should contain only factual allegations. It is inappropriate to allege legal conclusions."); *id.* ("Factual allegations not properly supported by citation to the record are nullities."). Additionally, where a party improperly denied a statement of fact by failing to provide adequate or proper record support for the denial, the Court deems admitted that statement of fact. *See* L.R. 56.1(a), (b)(3)(B); *see also Malec*, 191 F.R.D. at 584 (failure to adhere to L.R. 56.1 requirements, including citation to specific evidentiary materials justifying denial, is equivalent to admission). The Court disregards any additional statements of fact contained in a party's response rather than its statement of additional facts. *See Malec*, 191 F.R.D. at 584 (L.R.56.1(b)(3)(B) statement is the only acceptable means of presenting additional facts to the Court).

Plaintiff is a former Lilly employee who worked as a chemist in Lilly's Indianapolis office from April 1999 until October 2003, when she moved to Chicago to take a new position in Lilly's sales force. (D.E. 52 ¶ 2; D.E. 54 ¶ 2.) Plaintiff claims that when she interviewed for the new position, her interviewer and soon-to-be supervisor Sonia Newman promised her the title of "senior sales representative" (D.E. 52 ¶ 11), and promised that Ms. Kamboj would receive a

salary increase of two pay grades (*id.* ¶ 13), full tuition reimbursement for all of her MBA expenses (*id.* ¶ 18), and relocation expenses (*id.* ¶ 21).[3]

Plaintiff alleges that these promises constituted a binding oral contractual offer, and that she accepted the offer when she moved to Chicago to accept the new job. (D.E. 1 at 11.) Plaintiff claims that Lilly breached this contract by not giving her the promised title, not paying her an increased salary, and not paying for all of her subsequent tuition expenses. (*Id.* at 12.) Plaintiff further alleges that Ms. Newman fraudulently induced her to accept the new job and move to Chicago, knowing when she made the promises that she had no intention of keeping them. (*Id.* at 13.)

Regarding the promise of tuition reimbursement, Ms. Kamboj alleges that Ms. Newman's "'exact words' . . . were 'We'll take care of it all' and 'We'll pick up everything.'" (D.E. 54 at 5 ¶ 5.) Defendant disputes that Ms. Newman agreed to "100% educational reimbursement." (D.E. 59 at 3 ¶¶ 4–5.) Defendant argues that Ms. Newman's statements should be considered in proper context: The conversation was about whether Ms. Kamboj could continue to expect the same level of reimbursement Lilly had provided in her old job—not whether Lilly would pick up every educational expense Ms. Kamboj might subsequently incur while getting her MBA, something that is quite unusual within Lilly. (*Id.*; D.E. 54-12 at 8–9.) In particular, Defendant points to the following passage from Ms. Kamboj's deposition:

> The other thing was, we had started talking about education because [Ms. Newman] had said how much longer do you have for your MBA and I said I just started that year. She said, well, that's fine. I don't think it will interfere with your work *as long as your classes are on the weekends.* And I said, yeah, but I said my only concern is that, you

---

[3] Plaintiff conceded in the summary judgment record that she received reimbursement for all of her relocation expenses (D.E. 52 ¶ 44; D.E. 54 ¶ 44), so the Court does not further address this aspect of the claim.

know, my previous department is *reimbursing me for some of my coursework, you know, will I still be reimbursed*, and she said, yes, we'll take care of all of your MBA expenses and your education; you don't have to worry about that. We'll pick up everything. . . .

Q. When she said everything, did she tell you what she meant by that?

A. No, she said we'll pick up everything in your MBA expenses.

Q. So she wasn't any more specific?

A. No. She just said everything, so. She said her exact words were even in that conversation and on the phone, she said we'll take care of it all.

(D.E. 59 at 3 ¶ 5 (quoting D.E. 54-18 at 19 (Kamboj Dep. 234:16–235:21)) (emphasis added by Defendant).)

As to the promised increase in salary, Ms. Kamboj alleges that Ms. Newman told her during her job interview that the "position was salaried at a level 'two levels higher than what you're currently at,'" and that such a raise was "typical when an applicant was moving from a position in research into a sales position." (D.E. 54 at 5 ¶ 6.) Plaintiff claims Ms. Newman never quoted her a specific dollar amount or range for her new salary. Defendant asserts that Ms. Newman discussed the salary, not during the interview, but later when she offered Ms. Kamboj the job. (D.E. 59 at 4 ¶ 7.) Neither party states how much Ms. Kamboj was making in salary, either before or after starting the sales job, nor does either party explain the difference, if any, between a grade 50 salary, a grade 52 salary, a grade 54 salary, and a grade 56 salary. From the parties' Local Rule 56.1 Statements of Facts and their record citations, it is unclear whether salary grades at Lilly include a range of salaries and, in particular, whether those ranges overlap.

Ms. Kamboj moved into the new sales position in October 2003. (D.E. 52 at 5 ¶ 22.) On October 1, 2003, Ms. Kamboj received an "Advanced Notice of Transfer" from Lilly that listed her new position as "Sales Rep," instead of "Senior Sales Representative." (D.E. 54 at 3 ¶ 24.)

When Plaintiff asked Ms. Newman about the discrepancy, Ms. Newman told her that it was a "typo" and that her actual position was "Senior Sales Representative." (*Id.*) (Plaintiff claims Ms. Newman twice referred to the discrepancy as a "typo," but Defendant argues the record supports only one assurance that it was a "typo" (*See* D.E. 59 at 5 ¶ 5.) The Court could find only one alleged assurance that the discrepancy was a "typo" in the record. (*See* D.E. 54-19 at 3 (Kamboj Dep. at 249).)

Plaintiff was in sales training from October through December 2003, and she did not make her first solo customer calls until January 2004. (D.E. 52 at 5 ¶ 25.) In February 2004, during a ride-along with Ms. Newman, Ms. Kamboj first questioned the fact that her pay had not increased from what she had been making in her previous position as a chemist. (*Id.* ¶ 26.) Ms. Newman responded that she could not start Ms. Kamboj as a senior sales representative because she had no sales experience. (*Id.* ¶ 27.) However, Ms. Newman also told Ms. Kamboj during that February conversation that she would "check into it again," so Ms. Kamboj did not go to Human Resources about the matter. (D.E. 54-19 at 5 (Kamboj Dep. at 258).)

One month later, during a business review meeting in March 2004, Ms. Kamboj again raised the issue of her job title with Ms. Newman, and again Ms. Newman told her she was not a senior sales representative because she lacked sales experience and that this decision was not going to change. (D.E. 52 at 6 ¶ 28.) Ms. Newman again said she would "check with" Human Resources about Ms. Kamboj's concern about not being a senior sales representative. (*Id.* ¶ 29.) Ms. Kamboj never contacted HR herself because Ms. Newman always said she would handle it. (D.E. 54 at 3 ¶ 29.) By April 2004, Ms. Kamboj realized that she was not going to receive the title and salary that Ms. Newman allegedly promised her. (*Id.*) During Ms. Kamboj's April performance review, Ms. Newman explained that Ms. Kamboj would not be eligible for a

promotion to senior sales representative for three years. (D.E. 52 at 6 ¶ 30.) Ms. Kamboj considered this the final word on her position and title, but she continued to do her job, reasoning that if she performed well, "the rewards would come later." (*Id.* ¶ 31.)

Ms. Kamboj submitted her first tuition bill for reimbursement as a member of the sales team in March or April 2004. The bill came to $7,600, but she was told she was only eligible for a reimbursement of $7,000 annually. (*Id.* ¶ 32.) She understood this to be Lilly's final answer regarding her eligibility for tuition reimbursement. (*Id.* ¶ 33.) In August 2004, Ms. Kamboj requested approval for an educational leave, so that she could study at the London Business School for approximately three months. (*Id.* ¶ 34.) Her request was approved in late August, when she received written notice that the leave would be unpaid (*id.* ¶ 37); Ms. Kamboj was on leave from the end of August until the end of December 2004 (*id.* ¶ 36).

Plaintiff left her job in April 2005, claiming that she had been constructively discharged. (D.E. 1 at 11.) She filed suit in Cook County Circuit Court, alleging breach of contract (*id.*) and fraudulent misrepresentation (*id.* at 13). In July 2005, Defendant removed the case to this Court. (D.E. 1 at 1.) Defendant has filed a motion for summary judgment on all counts. For the reasons discussed below, Defendant's motion is denied in part and granted in part.

## SUMMARY JUDGMENT STANDARDS

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In determining whether there is a genuine issue of fact, the court "must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party." *Foley*, 359 F.3d at 928. To avoid summary judgment, the opposing party

7

must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (internal quotation marks and citation omitted). Summary judgment is proper against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). "The mere existence of a scintilla of evidence in support of the . . . [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## DISCUSSION

Ms. Kamboj claims that Lilly breached an oral contract to employ her as a "senior sales representative," to pay her an increased salary, and to reimburse her for all of her MBA expenses. She also claims that those oral promises were fraudulent when made, were intended to induce her to move from Indianapolis to Chicago to take the new job, and in fact did induce her to move, thus causing her to incur a legal detriment. Defendant has moved for summary judgment. For the reasons discussed below, Defendant's motion is denied in part and granted in part.

### I.     Breach of Contract

Plaintiff and Defendant agree that Plaintiff was an "at will" employee, meaning she had no fixed term of employment. Under Illinois law, employment contracts without fixed terms are presumed to be terminable at will by either party without liability. *See, e.g., Taylor v. Canteen Corp.*, 69 F.3d 773, 782 (7th Cir. 1995) (collecting cases, including *Duldulao v. St. Mary of Nazareth Hosp. Ctr.*, 505 N.E.2d 314, 318 (Ill. 1987)). This general rule is subject only to

8

independent contract or statutory provisions and concepts of retaliatory discharge. *See, e.g.*, *Harrison v. Sears, Roebuck & Co.*, 546 N.E.2d 248, 252–53 (Ill. App. Ct. 1989) (citing *Duldulao*, 505 N.E.2d at 318 (holding that parties may modify an at-will employment contract by an employee handbook or policy if contract-formation requirements are met)); *Palmateer v. Int'l Harvester Co.*, 421 N.E.2d 876, 877 (Ill. 1981) (recognizing the tort of retaliatory discharge). To overcome the presumption of at-will employment, an employee bears the burden of showing that the parties contracted otherwise. *See, e.g.*, *Taylor*, 69 F.3d at 782 (citing *Duldulao*, 505 N.E.2d at 318). Under Illinois law then, Ms. Kamboj must prove each of the following elements of a breach of contract claim: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach of the contract by the defendant; and (4) resulting injury to the plaintiff. *See, e.g.*, *Bommelman v. Transfer Print Foils, Inc.*, No. 97 C 2082, 2000 WL 816792, *8 (N.D. Ill. June 22, 2000) (citing *Gallagher Corp. v. Russ*, 721 N.E.2d 605, 611 (Ill. App. Ct. 1999)).

As a preliminary matter, the Court addresses whether Plaintiff's failure to allege promises of a specific term or duration of employment defeats her contract claim in the employment-at-will context. Defendant argues that because none of the promises alleged involves a specific term of employment, Plaintiff has not taken herself out of a traditional at-will employment arrangement. (*See* D.E. 51 at 7.) That being so, not only is either side free to terminate the employment contract at any time, but also the employer is free to modify it at any time as a condition of its continuance. *See Bommelman*, 2000 WL 816792, at *8 (citing *Schoppert v. CCTC Int'l Inc.*, 972 F. Supp. 444, 477 (N.D. Ill. 1997)). "In other words, 'an employee's continuation constitutes consideration for the employer's offer to modify the employment contract.'" *Bommelman*, 2000 WL 816792, at *8 (quoting *Doyle v. Holy Cross Hosp.*, 682

9

N.E.2d 68, 71 (Ill. App. Ct. 1997)). The district court in *Schoppert* found that the unilateral change by the employer was valid because the employee continued his performance without making restoration of his prior employment terms. *See Schoppert*, 972 F. Supp. at 477–78.

Plaintiff responds that just because an employment contract is at-will does not mean it is not still a binding contract. (D.E. 53 at 10.) She concedes that the at-will agreement is terminable at any time by either party, but she argues that, whatever its duration, the contract's other terms must be upheld. (*Id.* at 10–11.) In this regard, Plaintiff's argument appears to be well-taken. Most modifications to at-will employment agreements in the case law do appear to involve specifying a term or duration of employment. *See, e.g., LaScola v. US Sprint Communications*, 946 F.2d 559, 563–64 (7th Cir. 1991) (noting limited exceptions to the rule of at-will termination). And where there is no such term, courts have held that there can be no breach of the agreement. *See, e.g., Lapine v. Edward Marshall Boehm, Inc.*, No. 89 C 8420, 1990 WL 43572, *8 (N.D. Ill. Mar. 28, 1990) (Kocoras, J.) (stating, in an alleged wrongful termination case, that "[i]t is well established that an employee has no cause of action for breach of an employment contract where that employment is on an at will basis."). However, these courts appear to be holding merely that *termination* of the agreement cannot constitute a breach, not that failure to uphold the agreement's other terms—salary and benefits, for example—cannot create a claim for breach of contract, particularly as to property rights already obtained. *See Czapla v. Commerz Futures, LLC*, 114 F. Supp. 2d 715, 720 (N.D. Ill. 2000) (Kocoras, J.) ("[A]n employee can still demand the promised benefits under an at-will agreement with his employer even though that employee cannot enforce its employment provision.").

That a contract is "at will" is significant in that an employer can discharge an employee at any time. *Id.* (citation omitted). "Nevertheless, an at-will contract is still a contract with binding

10

terms." *Id.* (citation omitted). *Accord Alerquin v. Gen'l Fire Extinguisher Corp.*, No. 94 C 5991, 1995 WL 493446, *11 (N.D. Ill. Aug. 15, 1995) (Nordberg, J.) ("Although a plaintiff may not enforce the employment provision of an 'at will' contract, an employee can still demand benefits promised pursuant to an agreement with her employer. The 'at will' portion of the agreement means only that the employer may discharge an employee without a reason at any time. An 'at will' contract is still a contract, however, . . . and its terms are still binding."); *see also Jordan v. Duff and Phelps, Inc.*, 815 F.2d 429, 438 (7th Cir. 1987) ("[E]mployment at will is still a contractual relation, one in which a particular duration ('at will') is implied in the absence of a contrary expression . . . . One term implied in every written contract and therefore, we suppose, every unwritten one, is that neither party will try to take opportunistic advantage of the other.") (internal citation omitted). Upon this backdrop, the Court agrees with Plaintiff that she may assert a claim for breach of the *other terms or conditions* of her at-will employment contract, even though she would not be able to assert a claim for *termination* of that contract, or for a unilateral modification of that contract past any time of her acceptance of it. The absence of a specific term or duration of employment in her allegations, standing alone, does not defeat her oral contract theory.

The Court now proceeds to Plaintiff's contract-based claims. Plaintiff first argues that Ms. Newman's oral promises, coupled with Plaintiff's acceptance (moving to Chicago to take the job), constitute a binding oral contract to modify her at-will employment agreement, and that Lilly breached that contract by failing to grant the promised salary, title, and benefits. Second, Plaintiff argues that even if Plaintiff's acceptance is not supported by adequate consideration, Defendant is promissorily estopped from reneging on its promises. Third, Plaintiff argues that the implied covenant of good faith and fair dealing requires enforcing Defendant's promises.

Each argument is addressed below in turn.

## A. Oral Modifications to At-Will Employment

To modify an at-will employment agreement by oral promises, the plaintiff must establish that the offer was (1) "clear and definite," and (2) that it was supported by adequate consideration. *Taylor*, 69 F.3d at 782 (citation omitted). In this case, Plaintiff must also establish that she has not accepted the modified terms of that contract by continuing to work under them with knowledge of the modified terms. As discussed below, Plaintiff has sufficiently shown (at least taking all factual disputes and inferences in her favor) that an oral contract for a particular title and salary existed from October 2003 to March or perhaps April 2004. Her contract claim survives summary judgment as to that multi-month period. However, by March 2004, or April 2004 at the latest, it is clear that Ms. Kamboj knew that Lilly was not going to perform according to the terms of the alleged oral contract. By continuing to work an additional year past that discovery, with full knowledge of the "new terms" (Lilly, of course, asserts that there never were any other terms because it denies any oral contract was otherwise offered or reached in the first place), Ms. Kamboj accepted Lilly's "new terms" and therefore has no breach of contract claim with respect to the period between April 2004 and April 2005.

### 1. Clear and Definite Promises

Whether a promise is "clear and definite" depends on whether the court can ascertain from its terms what the parties have agreed to do. *See, e.g.*, *Academy Chicago Publishers v. Cheever*, 578 N.E.2d 981, 983 (Ill. 1991). *Duldulao* stated that the promise contained in the offer must be "clear enough that an employee would reasonably believe that an offer has been made." *Duldulao*, 505 N.E.2d at 318. In the employment context, the case law tends to focus on promises of permanent employment, *e.g., Taylor*, 69 F.3d at 782–83 & n.3; however, the courts

have offered some guidance on promises regarding other terms of employment, such as titles and salaries. In *Krieger v. Adler, Kaplan & Begy*, No. 94 C 7809, 1997 WL 323827, *9 (N.D. Ill. June 11, 1997) (Leinenweber, J.), the court held that an employer's oral promise to employ the plaintiff as a "senior trial attorney" was clear and definite, as was a promise of an $85,000 salary and a bonus of not less than 10 percent of the fees collected from new clients brought in by the plaintiff. *See id.* (citing *Duldulao*, 505 N.E.2d at 318). *Krieger* also found that an alleged promise to promote plaintiff and to support his development of business, "while open to different interpretations, could be considered to be an offer." *Id.* However, a promise to make Krieger a partner within "a short period of time" was too vague to be considered an offer. *Id.*

In this case, Plaintiff has alleged that Ms. Newman promised her a title of "senior sales representative," a salary increase within the Lilly system of two "levels," and full tuition reimbursement. Defendant disputes that these promises were made but argues that, even if they were, they were too vague to constitute an offer. The Court respectfully disagrees. The offer of the title "senior sales representative" is clearly sufficiently definite under *Krieger*. Moreover, although Plaintiff acknowledges she was never given a specific salary offer, she repeatedly alleges that she was promised a pay increase of two "levels" or "grades." Construing the facts in Plaintiff's favor, as is required at this stage of the proceedings, the Court finds that Ms. Kamboj reasonably could have believed an offer of an increased and ascertainable salary had been made. Finally, with respect to the alleged promise of "full tuition reimbursement," it is unclear from the record whether Ms. Newman's promise to "pick up everything" referred to "everything" Lilly had been paying for tuition up to that point, or whether it meant that, once Ms. Kamboj started her new position, Lilly would—in a seemingly extraordinary step within its corporate culture—literally pay for every cost incurred by Ms. Kamboj to obtain her MBA. As a result,

13

this issue too is appropriate for resolution by way of summary judgment.

### 2. Adequate Consideration

In addition to a "clear and definite" promise, an oral modification to an at-will employment agreement must be supported by adequate consideration. *See, e.g., Taylor*, 69 F.3d at 782 (citation omitted). As with the "clear and definite" requirement, cases discussing the consideration requirement in the employment context tend to deal with lifetime employment contracts, as opposed to modifications of other terms. *See McInerney v. Charter Golf, Inc.*, 680 N.E.2d 1347, 1349–50 (Ill. 1997). Still, these cases focus on basic contract principles, *see id.* at 1350, and therefore appear to apply equally to cases such as this one, where the modified terms involve salary and title, not duration of employment.

Absent special circumstances, the mere relinquishment of a prior job to take a new job is insufficient consideration. But if the employee's forbearance is a "specially bargained for detriment," or causes the employee to suffer a particular detriment, it can be said that the employee has surrendered something of value in exchange for the promise of employment, and therefore that adequate consideration exists. *Taylor*, 69 F.3d at 783–84 (other quotation marks and citations omitted). "Detriment" as used in determining the sufficiency of consideration means "legal detriment as distinguished from detriment in fact. It means giving up something which immediately prior thereto the promisee was privileged to retain, or doing or refraining from doing something which he was then privileged not to do, or not to refrain from doing." *Davies v. Martel Laboratory Services, Inc.*, 545 N.E.2d 475, 477 (Ill. App. Ct. 1989) (collecting authorities). *Davies* held that the plaintiff supplied adequate consideration where she agreed to obtain an MBA and serve on her employer's President's Council in exchange for a promise of permanent employment. *See id.* In so holding, *Davies* explained that the concept of "legal

14

detriment" is a relatively broad one, stating by way of example that "a promise to give up smoking may be a benefit to the promisee's health, but a promise to give up smoking is also a legal detriment and sufficient consideration to support a contract." *Id.* (citation omitted). In addition, *Davies* explained, under Illinois law being lured away from an existing job with the promise of permanent employment, or rejecting a more lucrative offer, is enough. *Id.*; *accord McInerney*, 680 N.E.2d at 1350; *see also Dumas v. Infinity Boradcasting Corp.*, 416 F.3d 671, 679 (7th Cir. 2005) ("'[A]ny act or promise which is of benefit to one party or disadvantage to the other is a sufficient consideration to support a contract.'") (quoting *Steinberg v. Chicago Medical School*, 371 N.E.2d 634, 640 (Ill. 1977)).

In this case, Plaintiff moved from Indianapolis to Chicago based on Defendant's promises of higher pay, a senior title, and full tuition reimbursement. Defendant argues that Ms. Kamboj suffered no detriment because she was happy to move to home to Chicago. (*See* D.E. 51 at 5–6.) However, this position misconstrues the concept of legal detriment described above, at least as a jury might reasonably apply it. The Court finds that a jury could reasonably find that Plaintiff gave up her privilege to remain in Indianapolis specifically because of the promises made by Defendant, and that this could constitute (at least on the basis of the summary judgment record as presented) adequate consideration to support Defendant's oral promises. Therefore, summary judgment against Plaintiff is inappropriate on such basis.

### 3. Acceptance of Lilly's Modified Terms

Defendant argues that, even if an oral contract existed, Plaintiff accepted its terms by continuing to work under them for a year after she realized that Lilly was not going to honor those terms. (*See* D.E. 51 at 7–8.) Indeed, caselaw instructs that, not only may an employer modify the terms of an at-will employment contract (including compensation terms) as a

condition of continuance, *see Schoppert*, 972 F. Supp. at 447, but caselaw further reflects that continuance under the modified conditions is both acceptance of the new terms and consideration in return for new wages paid. *See, e.g., id.* (citing *Garber v. Harris Trust & Savings Bank*, 432 N.E.2d 1309, 1315–16 (Ill. App. Ct. 1982)); *Geary v. Telular Corp.*, 793 N.E.2d 128, 131 (Ill. App. Ct. 2003); *see also Bommelman*, 2000 WL 816792, at *8–9.

Defendant argues that this principle precludes relief entirely. (*See* D.E. 51 at 9.) The Court respectfully disagrees, at least within the context of summary judgment standards. In this regard, the record is fairly clear that from October 2003 until March or April 2004, Ms. Kamboj was unaware of the fact that Lilly was not going to fulfill Ms. Newman's alleged promises. Therefore, it cannot be said that she "accepted" the modified terms during this period. Moreover, it is undisputed that she performed under the terms of her contract during this period and that Lilly did not pay her according to Ms. Newman's alleged promises. Therefore, Plaintiff has made a sufficient showing to establish a potential breach of contract under Illinois law.

After the initial five- or six-month period, however, Ms. Kamboj was fully aware that she was not going to receive the "senior sales representative" title, the increased salary, or full tuition reimbursement. She accepted the "modified" terms by continuing to work a full year after this discovery—notwithstanding that the terms were inconsistent with the alleged oral terms created by Ms. Newman. Ms. Kamboj has no claim for breach of contract with respect to this latter period, and therefore, as to that period, Defendant's motion for summary judgment is granted.

**B.    Promissory Estoppel**

Ms. Kamboj also argues that, if no contract existed, she should be granted relief based on a theory of promissory estoppel. (*See* D.E. 53 at 12.) As discussed below, this claim fails because under Ms. Kamboj's version of events, if credited, she has an express oral contract

16

and/or fraud claim; if Defendant's version is credited, Ms. Kamboj has nothing. There is no room for a promissory estoppel theory under such circumstances.

The Illinois Supreme Court has delineated a four-part test to determine whether a claim for promissory estoppel may succeed. *See Dumas*, 416 F.3d at 676–77 (discussing *Quake Constr., Inc. v. American Airlines, Inc.*, 565 N.E.2d 990, 1004 (Ill. 1990)). A plaintiff must prove that "'(1) defendants made an unambiguous promise to plaintiff, (2) plaintiff relied on such promise, (3) plaintiff's reliance was expected and foreseeable by defendants, and (4) plaintiff relied on the promise to its detriment.'" *Dumas*, 416 F.3d at 676–77 (quoting *Quake Constr., Inc.*, 565 N.E.2d at 1004). The Seventh Circuit, applying Illinois law, has emphasized, however, that "[p]romissory estoppel is not a doctrine designed to give a party . . . a second bite at the apple in the event that it fails to prove a breach of contract. Under Illinois law, a claim for promissory estoppel will only succeed where all the other elements of a contract exist, but consideration is lacking." *Dumas*, 416 F.3d at 677 (further Illinois and Seventh Circuit citations omitted).

In its summary judgment motion, Lilly globally attacks the promissory estoppel claim, and argues that Illinois no longer recognizes a cause of action for promissory estoppel. (*See* D.E. 58 at 8 (citing *DeWitt v. Fleming*, 828 N.E.2d 756, 759 (Ill. App. 5th Dist. 2005).) To be sure, Illinois law is in a state of potential flux concerning promissory estoppel, with *DeWitt*, among other intermediate appellate cases, holding that promissory estoppel "is not a proper vehicle for direct relief" in Illinois and is only "meant to be utilized as a defensive mechanism—not as a means of attack." 828 N.E.2d at 759 (quoting *ESM Development Corp. v. Dawson*, 795 N.E.2d 397, 403 (Ill. App. Ct. 2003) (internal quotation marks omitted)). *DeWitt* reasoned that "an explicit rule of law that promissory estoppel exists only for defensive purposes in Illinois

promotes the stability and integrity of Illinois jurisprudence and provides attorneys practicing in Illinois, as well as their clients, with a clear, stable guidepost to which they may conform themselves." *Id.*, 828 N.E.2d at 760.

However, as pointed out by several courts sitting in diversity in this district, these holdings are relatively novel, and *Quake Constr., Inc.*, is the Illinois Supreme Court's last word on the subject. *See TNT Logistics North America, Inc. v. Bailly Ridge TNT, LLC*, No. 05 C 7219, 2006 WL 2726224, *10 (N.D. Ill. 2006) (citing, *inter alia, Ogdon v. Hoyt*, 409 F. Supp. 2d 982, 989 n.4 (N.D. Ill. 2006)); *LM Insurance Corp. v. Sourceone Group, Inc.*, 454 F. Supp. 2d 727, 741 (N.D. Ill. 2006) ("Although Illinois appellate courts disagree whether promissory estoppel can be a direct cause of action, LM is correct that the Illinois Supreme Court's decision in *Quake* . . . still stands as the governing law in Illinois concerning promissory estoppel."); *see also Dumas*, 416 F.3d at 681 n.11 (discussing foment in Illinois intermediate appellate courts). In this regard, it is worth noting that the intermediate Illinois appellate courts are split, with certain cases holding that *Quake Constr., Inc.*, is the definitive word on the subject. *See, e.g., Chatham Surgicore, Ltd. v. Health Care Serv. Corp.*, 826 N.E.2d 970, 975 (Ill. App. 1st Dist. 2005) (citing *Quake Constr., Inc.*, and holding that plaintiff stated an affirmative claim for promissory estoppel). Absent further guidance from the Illinois Supreme Court, this Court assumes for purposes of this decision that a claim for promissory estoppel is still available in Illinois.

Nevertheless, the promissory estoppel claim alleged here does not survive summary judgment, because Plaintiff appears to have asserted sufficient consideration in her contract claim, at least if her version of events is credited. As discussed above, promissory estoppel is applicable only under certain narrow circumstances to serve "as substitute for consideration or an exception to its ordinary requirement." *Dumas*, 416 F.3d at 677 (quoting *Bank of Marion v.*

*Robert "Chick" Fritz, Inc.*, 311 N.E.2d 138, 140 (Ill. 1974)). As the Seventh Circuit has taught, "Promissory estoppel is not a doctrine designed to give a party a second bite at the apple in the event it fails to prove a breach of contract." *All-Tech Telecom Inc. v. Amway Corp.*, 174 F.3d 862, 869–70 (7th Cir. 1999) (internal punctuation and citation omitted). Where there is an (alleged) express oral contract concerning a subject, and no issue of consideration, "there is no gap in the remedial system for promissory estoppel to fill." *Id.*

As explained above, it is currently unsettled in Illinois law whether promissory estoppel can be used as a sword, as Plaintiff would do here. That debate need not be resolved in this case, however, because even if one assumes the resolution of this question in Plaintiff's favor, this is not a case where promissory estoppel, as applied previously within the contours of Illinois law, can afford relief. Plaintiff has alleged an express oral contract, and under her version of events, if they are credited by the jury, it appears that she has suffered at least legal detriment as that term is understood in the law. *See, e.g., Davies*, 545 N.E.2d at 477 (explaining that a promise to quit smoking, while certainly beneficial to the promisor's own health, is also a legal detriment and is sufficient consideration to support a contract). Accordingly, the promissory estoppel claim is dismissed.[4]

## C.     The Implied Covenant of Good Faith and Fair Dealing

Plaintiff also briefly raises the implied covenant of good faith and fair dealing in her brief opposing summary judgment. (*See* D.E. 53 at 11 (citing *Industrial Speciality Chemicals, Inc. v. Cummins Engine Co., Inc.*, 902 F. Supp. 805, 811 (N.D. Ill. 1995)). Plaintiff has not presented

---

[4] To the extent the Defendant intends to argue at trial that there was no consideration as that term is understood in the law, the Court reserves the right to revisit whether a promissory estoppel theory could be presented in the alternative to the jury.

this issue as an independent claim, but the Court addresses whether Plaintiff might obtain relief for violation of the implied covenant as part of her contract claim.

An obligation to deal in good faith is implied in all Illinois contracts. *LaScola*, 946 F.2d at 565 (citing *Triad Assocs., Inc. v. Chicago Hous. Auth.*, 892 F.2d 583, 589 (7th Cir. 1989)). "Such an obligation is in aid and furtherance of other terms of the agreement of the parties. It does not create an independent cause of action." *LaScola*, 946 F.2d at 565 (quoting *Gordon v. Matthew Bender & Co.*, 562 F. Supp. 1286, 1290 (N.D. Ill. 1983)) (internal quotation marks omitted); *see also Jordan*, 815 F.2d at 438 ("One term implied in every written contract and therefore, we suppose, every unwritten one, is that neither party will try to take opportunistic advantage of the other. . . . The element of good faith dealing implied in a contract is not an enforceable legal duty to be nice or to behave decently in a general way. . . . It is not a version of the Golden Rule, to regard the interests of one's contracting partner the same way you regard your own. An employer may be thoughtless, nasty, and mistaken.") (internal quotation marks and citations omitted).

In Illinois, at-will employees may not use the implied covenant to limit an employer's right to fire them. Precedent teaches that because at-will employment "'gives the employer the right to terminate the employment at any time . . . . it is incongruous to imply a covenant [*i.e.*, a general covenant of good faith and fair dealing] which restricts that right.'" *LaScola*, 946 F.2d at 565 (quoting *Harrison*, 546 N.E.2d at 256; brackets in *LaScola*).

The Illinois courts have been reluctant to "eviscerate" the at-will doctrine, *id.*, 946 F.2d at 566, yet, as explained above, precedent instructs that a cause of action for a contractual breach may exist when it is predicated on a contract right with independent validity. *Id.* (discussing *Gordon*, 562 F. Supp. at 1297 n.5) (quotation marks omitted). In this regard, "'[t]he law seems

fairly clear that an employee at will may not be deprived of commissions (in large part "earned" prior to separating from the employer) by a discharge made in bad faith and intended to deprive the employee of the commissions.'" *LaScola*, 946 F.2d at 566 (quoting *Gordon*, 562 F. Supp. at 1297). Similarly, the Seventh Circuit has taught, "no one . . . doubts that an avowedly opportunistic discharge is a breach of contract, although the employment is at-will." *Jordan*, 815 F.2d at 438.

Like the plaintiff in *Gordon*, Ms. Kamboj seeks the benefits promised to her for the work she performed under that contract. As discussed above, Ms. Kamboj is not attempting to restrict Lilly's right to terminate her at will; she is arguing only that the other terms of her at-will contract should be upheld for the period of time that the alleged contract was in effect, whatever that period turned out to be. So framed, she is arguing for protection of the benefit of her bargain, at least up until the time (March or April of 2004) when it became clear to Ms. Kamboj that the alleged contract was no longer in effect if she intended to remain employed by (and paid by) Lilly. *See Jordan*, 815 F.2d at 438.

Because her contract claim survives, the implied covenant of good faith and fair dealing remains at least theoretically in the case. However, this is not to say that the implied covenant of good faith and fair dealing has much of a potential role to play, if any. As the Seventh Circuit emphasized in *Jordan*, 815 F.2d at 438, an at-will employer is not obligated, under the doctrine of good faith and fair dealing, to act as though it is bound by the Golden Rule; in fact, the employer may be "thoughtless, nasty, and mistaken." *Id.* Thus, the doctrine of good faith and fair dealing cannot be understood to restrict Lilly's ability to require new terms of the at-will employment as a condition of prospective maintenance of that employment relationship—which

21

modification, under even Ms. Kamboj's version of events, she knowingly accepted as of March or April 2004.

Because there is no "implied covenant" claim to dismiss (or let stand), the Court believes the most appropriate way to deal with this issue is through appropriate jury instructions, to the extent the matter is a real issue at trial at all. As explained, given precedent concerning the limited role of the implied covenant in this setting, the significance of the matter may be more theoretical than real.

## II.    Fraudulent Misrepresentation

Under Illinois law, the elements of a fraudulent misrepresentation claim are that: (1) the representation at issue was a statement of a material fact, rather than a mere promise or opinion; (2) the representation was false; (3) the person making the statement knew or believed that the representation was false when made; (4) the person to whom the representation was made reasonably relied on the truth of the statement; (5) the statement was made for the purpose of causing the other party to affirmatively act; and (6) reliance on the statement led to that other party's injury. *LaScola*, 946 F.2d at 567–68 (citing *Chicago College of Osteopathic Medicine v. George A. Fuller Co.*, 719 F.2d 1335, 1347 (7th Cir. 1983)); *see also Teamsters Local 282 Pension Trust Fund v. Angelos*, 839 F.2d 366, 370 n.2 (7th Cir. 1988). As discussed in detail below, there are genuine factual issues regarding whether Ms. Newman's alleged statements were knowingly false when made as well as whether Ms. Kamboj justifiably relied on them. Therefore the fraudulent misrepresentation claim survives summary judgment.

### A.    Fraudulent Intent

To show that a statement is knowingly false and made with the intention of inducing reliance, "a claimant must be able to point to specific, objective manifestations of fraudulent

intent—a scheme or device." *Bower v. Jones*, 978 F.2d 1004, 1012 (7th Cir. 1992). In a case

such as this one, where the fraud involves promises of future conduct, that task includes

determining whether the promises are part of a pattern of deceptions—or, put differently,

whether "the false promise or representation of future conduct is alleged to be the scheme

employed to accomplish the fraud." *Steinberg*, 371 N.E.2d at 641 (collecting cases). Caselaw

reflects that "'[p]romissory fraud is a disfavored cause of action in Illinois because fraud is easy

to allege and difficult to prove or disprove.'" *Krieger*, 1997 WL 323827, at *6 (quoting *Bower*,

978 F.2d at 1012). The limitation on such actions reflects an interest in preventing every breach

of contract claim from becoming a suit for fraud. *Id.*, 1997 WL 323827 at *6 (citing *Desnick v.*

*American Broadcasting Companies*, 44 F.3d 1345, 1354 (7th Cir. 1995)). The Seventh Circuit,

applying Illinois law, has said that promissory fraud is not actionable unless it is "particularly

egregious or, what may amount to the same thing, it is embedded in a larger pattern of deceptions

or enticements that reasonably induces reliance and against which the law ought to provide a

remedy." *Desnick*, 44 F.3d at 1354.

     In this case, Plaintiff has shown that there are genuine material issues regarding whether

Ms. Newman had a fraudulent intent when she made alleged promises to Ms. Kamboj. Plaintiff

has presented evidence of Ms. Newman's alleged promises and evidence that those promises

were not carried out. In addition, there are factual issues regarding whether Ms. Newman

engaged in a scheme or device to deceive Ms. Kamboj—with Ms. Newman allegedly having

engaged in various misrepresentations and lulling statements to induce Ms. Kamboj to believe

that all would be well (or at least *could* be well) when, if Ms. Kamboj's theory is believed, Ms.

Newman knew all along that she could not deliver on the alleged false promises. In *Krieger*, the

court found a genuine issue of fact existed regarding fraudulent intent where the plaintiff claimed

his employer promised him he would have the title "senior trial attorney," but then made clear that it would not hold him out as anything but an "associate." *See* 1997 WL 323827, at *8. "Given the fact that . . . within a matter of months it became apparent that AKB had no intention of holding Krieger out as anything but an 'associate,' a reasonable jury could find that Begy made an express promise that he never had an intention of keeping. Additionally, a reasonable jury could find that plaintiff relied on this promise in moving to Chicago and in rejecting another job offer." *Id.*

This case is similar to *Krieger*. As in *Krieger*, the record in this case is susceptible to differing interpretations, at least some of which are not actionable under a fraud theory. For example, Ms. Newman may have made the promises alleged, intending to fulfill them, only to discover later that company policy would not allow it. (*See* D.E. 54-19 at 5 (Kamboj Dep. at 256) ("Q: So . . . she said she had made a mistake and you couldn't be a senior sales rep? A: She said, yeah, I'm sorry, you're not—you can't be at a senior sales representative level. I looked into it and you don't have sales experience.").) Or Ms. Newman may have changed her mind about the salary and title for which Plaintiff qualified. That scenario also would not be actionable as fraud: "A change of mind can be a breach of contract . . . but it is not fraud." *Price v. Highland Community Bank*, 722 F. Supp. 454, 459–60 (N.D. Ill. 1989) (Posner, J., sitting by designation).

However, the facts also support a possible interpretation that Ms. Newman knew her alleged promises were false when made, and that those promises were part of a pattern of deceptions. Ms. Newman allegedly promised the senior sales title and increased salary, and/or made related alleged lulling statements, up to four times. In this regard, Ms. Newman first made the alleged promises during Ms. Kamboj's job interview. (D.E. 52 ¶¶ 11, 13, 18, 21.) Then, in

24

October 2003, right after Ms. Kamboj started the new job, Ms. Newman allegedly said an advance transfer notice listing the title as "sales representative" was probably just "a typo." (D.E. 54 ¶ 24.) In February 2004, Ms. Newman allegedly told Ms. Kamboj she could not have the job and salary that had been promised (D.E. 52 ¶¶ 26, 27), but Ms. Newman also allegedly said she would check with Human Resources again, leading Ms. Kamboj to refrain from doing so herself, and leaving hope that the promises would be fulfilled. (D.E. 54-19 at 5 (Kamboj Dep. at 258).) In March 2004, at a business review meeting, the issue of Ms. Kamboj's title and salary came up again. According to Ms. Kamboj, Ms. Newman "was very direct" about Ms. Kamboj not getting the higher salary and title. (*Id.* at 6 (Kamboj Dep. at 260).) Ms. Newman said, "[Y]ou don't have sales experience and, you know, I can check with HR. If you want, you can call HR." (*Id.* at 6 (Kamboj Dep. at 260–61).) This passage of Ms. Kamboj's deposition testimony continues as follows:

> Q: And in the conversation in March, did she tell you at that point it's not going to change but if you want to call HR, you can? . . . .
>
> A: [Y]eah, she said it's not going to change because you don't have sales experience. She had said—actually, she had not said call HR. She said I'll talk to HR because I just remember trusting her, and I never contacted HR on my own. . . . [I]t was never a direct yes or no. It was always very vague. And I just continued to trust her on that, that she was talking to HR and I didn't want to contact them.

(*Id.* at 6 (Kamboj Dep. at 261–62).) In April 2004, Ms. Kamboj finally realized for sure that she would not receive the title or salary Ms. Newman had allegedly promised her. (*Id.* at 7 (Kamboj Dep. at 264).)[5]

---

[5] Likewise, in April 2004, when Ms. Kamboj submitted her first request for tuition reimbursement as a member of the sales organization, she was told she was only eligible for a maximum of $7,000 per year; she understood this to be Lilly's final answer regarding such reimbursements. (D.E. 52 ¶¶ 32, 33.) However, during the period leading up to April 2004, Ms. Newman also apparently continued trying to "sell" Ms. Kamboj on the new job and on the move

In sum, it is unclear from the record whether Ms. Newman engaged in a pattern of deceptions and lulling statements designed to induce Ms. Kamboj to move to Chicago for the new job and to keep doing her job. Therefore, summary judgment on such basis is inappropriate.

## B.    Justifiable Reliance

In addition, there are genuine factual issues regarding whether Plaintiff justifiably relied on Ms. Newman's alleged promises. "Normally, whether reliance is justifiable is a question of fact that is unsuited for resolution on summary judgment." *Am. Nat'l Bank and Trust Co. of Chicago v. Axa Client Solutions LLC*, No. 00 C 6786, 2004 WL 438505, at *4 (N.D. Ill. Mar. 5, 2004) (citing, *inter alia*, *Cozzi Iron & Metal, Inc. v. U.S. Office Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001)). Seventh Circuit precedent teaches that reliance "can be determined as a matter of law when no trier of fact could find that it was reasonable to rely on the alleged statements or when only one conclusion can be drawn." *Cozzi*, 250 F.3d at 574 (citation omitted). In considering whether Plaintiff's reliance was justified, the Court must consider all of the facts that Plaintiff knew, as well as those facts Plaintiff could have discovered through the exercise of ordinary prudence." *See, e.g.*, *Teamsters Local 282 Pension Trust Fund*, 839 F.2d at 370. The Court's task, then, is to review all of the information known to Plaintiff (or discoverable to Plaintiff through the exercise of ordinary prudence) at the time Plaintiff entered the contract in question and to determine whether, "given that pool of information, no trier of fact could find that . . . [Plaintiff's] purported reliance on the statements and omissions at issue was reasonable or justified." *Talton v. Unisource Network Services, Inc.*, No. 00 C 7967, 2004 WL 2191605, * 7 (N.D. Ill. Sept. 27, 2004).

---

to Chicago. (D.E. 54-19 at 7 (Kamboj Dep. at 264).)

On this record, construing the facts in Plaintiff's favor, the trier of fact could find that

Plaintiff's reliance was justified—although Ms. Kamboj, by her own statements, likely faces an

uphill road in that regard about at least some of her claimed damages.  In addition to Ms.

Newman's multiple alleged promises and/or lulling statements, Ms. Kamboj appears to have had

access to Lilly's job postings, which she claims promised a senior title and increased pay grade.

(It is unclear from the record what was included in the posting Ms. Kamboj actually saw.  (*See*

D.E. 54-19 at 5 (Kamboj Dep. at 257) (Plaintiff stating that she thinks the job posting listed the

salary as being between level 54 and 56, but that she would be safer saying she doesn't remember

whether it said level 54 to 56 or level 50 to 56); D.E. 54-2 (noting other sales positions carried

salaries between levels 50 and 56).)  Ms. Kamboj also has presented evidence of internal Lilly

documents listing her title as "senior sales representative" (*see* D.E. 54-4 at 1–4 (Employee Short

Profile and "myElvis People Search" profile), suggesting that she may have reasonably relied on

those documents.  To be sure, Defendant has presented evidence disputing that all of those

internal listings were necessarily generated by Lilly (*see* D.E. 59 at 5 (describing how employees

may enter their own information into Lilly's "myElvis" system) (citing D.E. 54-14 (Plaintiff's

Ex. 13, Dana Schuch Dep.)).)  Furthermore, Ms. Kamboj has acknowledged that she was "kind

of stupid" and "naive" to accept some of Ms. Newman's alleged promises—and Plaintiff appears

to wisely concede that she has no reasonable reliance claim with respect to a supposed promise of

a potential $13,000 bonus each quarter within the context of the position at issue.  *See* D.E. 53 at

2.

It is a relatively close call, but the Court finds material issues sufficient to deny

Defendant's motion for summary judgment on Plaintiff's fraudulent misrepresentation claim.

The Court cannot say that no trier of fact could conclude that Plaintiff justifiably relied on

Defendant's promises—or at least one or more of them. It follows that Plaintiff's fraud claim, like her contract claim, survives within the parameters identified above in previous sections of the opinion.

## CONCLUSION

For the reasons given above, the Defendant's motion for summary judgment is denied in part and granted in part.

So ordered.

_____
Mark Filip
United States District Judge
Northern District of Illinois

Date: _1/18/07_____